**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JOSEPH F. BEGGINS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-1541 |
| | § | |
| CBRE CAPITAL MARKETS | § | |
| OF TEXAS L.P., | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

This case is about whether the plaintiff, Joseph Beggins, was entitled to receive more than half a million dollars when his employment ended. Beggins was a seconded chief executive officer for GEMSA Loan Services, a partnership between General Electric and the defendant, CBRE Capital Markets of Texas, L.P. When General Electric decided to leave the partnership, CBRE offered Beggins a retention bonus if he agreed to oversee the transition for the rest of the year. Beggins did oversee the transition, but Beggins and CBRE could not agree on some retention-agreement provisions. Beggins ended his work for CBRE, but it did not pay Beggins the retention bonus. Beggins tried to apply for benefits under CBRE's severance pay policy, but CBRE did not respond to Beggins's benefits claim. Beggins sued, asserting claims for breach of contract, promissory estoppel, negligent misrepresentation, and wrongful denial of ERISA benefits. (Docket Entry No. 11). After discovery, CBRE moved for summary judgment on all four claims, and Beggins responded, agreeing to dismiss the promissory estoppel and breach of contract claims. (Docket Entry Nos. 19 ¶ 3; 20 ¶ 1). CBRE replied. (Docket Entry No. 20). The court granted leave for CBRE to amend its answer and both parties submitted supplemental briefing to CBRE's motion for summary judgment and Beggins's response. (Docket Entry Nos. 24, 25, 26).

1

Based on the motion, response, reply, the supplemental briefs, the record, and the applicable law, CBRE's motion for summary judgment, (Docket Entry No. 16), is granted in part and denied in part. The reasons for this ruling are explained below. A scheduling and status conference is set for **Friday, July 13 at 3:00p.m.**

## I.      Background

Beggins led GEMSA Loan Services as its seconded chief executive officer for over a decade. (Docket Entry No. 16 ¶ 19). GEMSA was a partnership between a CBRE subsidiary and a General Electric Corporation subsidiary. (*Id.*). During this time, Beggins was considered a CBRE employee, paid by CBRE. (Docket Entry No. 19, Ex. A, Joseph Beggins Dep. 33: 10-24).

In April 2015, General Electric decided to leave the GEMSA partnership, requiring a reduction in the number of employees and the partnership's dissolution. (Docket Entry No. 16 ¶ 20). CBRE planned to end Beggins's employment, but General Electric wanted Beggins to stay and protect its interests in the transition period. (Docket Entry No. 19, Ex. B, Chris Shamaly Dep. 51: 4–13). CBRE offered Beggins a retention agreement as an incentive to help with the transition through the end of the year. (Docket Entry No. 16 ¶ 20).

In May 2015, General Electric's global head of asset management, Joe Manasseri, called Beggins to tell him that he would soon receive a formal retention agreement calling for an $800,000 payment. (Docket Entry No. 19, Ex. A, Joseph Beggins Dep. 120: 15–121: 12). One month later, Beggins received a phone call from a GEMSA board member, Neil Sullivan, to discuss the agreement. Sullivan told Beggins that the amount would be closer to $827,000. (*Id.* 113: 1–25). General Electric decided to structure the agreement to pay $200,000 for Beggins's continued employment through the year's end and to pay $627,000 in place of the amount Beggins would have received under CBRE's severance policy. (*Id.*, Ex. B, Chris Shamaly Dep. 46: 1–20).

2

On July 22, 2015, another GEMSA board member, Jeff Majewski, sent Beggins a copy of the retention agreement and a release form. (*Id.* ¶ 12). The retention agreement provided in relevant part:

> 1. **Background:** You are currently employed by CBRE and seconded to GEMSA Loan Services . . . as that company's Chief Executive Officer. . . . The [General Electric] Partner has informed the CBRE Partner that it intends to . . . withdraw as a partner of GEMSA on or about August 31, 2015 . . . .
>
> 2. **Retention Period**: CBRE desires that you continue employment with CBRE at your current salary through the earlier to occur of either (a) the last day of the month in which the IT Migration Occurs, or (b) December 31, 2015 . . . .
> . . .
>
> 5. **Payments:** In lieu of any bonus consideration that you may have been eligible for under GEMSA or CBRE bonus plan and CBRE's Severance Policy, CBRE agrees to pay you a "Retention Bonus" equal to $827,202 . . . within twenty (20) days following the completion of working through the Retention Period . . .
>
> 6. **Breach:** If you do not either (a) return a fully executed copy of this Agreement by email by the date set forth below, or (b) meet the Retention Period obligations . . . CBRE may terminate your employment effective August 31, 2015 and you will not be eligible for the Retention Bonus . . . but instead will receive severance equal to $471,868 . . . .
> . . .
>
> 10. **Employee Release of Claims:** As a condition of receiving the Retention Bonus and/or severance, employee agrees to execute CBRE's General Release and Agreement at the end of employee's employment. . . .

(Docket Entry No. 16, Ex. A at 7–8). The CBRE General Release provided:

> Employee does hereby, and for Employee's heirs, legal representatives, agents, successors in interest, and assigns, irrevocably and unconditionally release, acquit, and forever discharge CBRE and all of its Agents . . . of and from all claims, actions, causes of action, rights, demands, debts, obligations, damages, or accounts of whatever nature arising through the date hereof . . . which

> Employee has against [CBRE and all of its Agents] by reason of or arising out of Employee's employment with CBRE or any other matters of whatever nature, whether known or unknown . . . .

(*Id.*, Ex. B ¶ 7(A)).

Beggins consulted with his attorney and sent proposed changes to the retention agreement and release form two weeks later. (*Id.*, Ex. F). In one of the many revisions, Beggins proposed to change the language releasing "CBRE and all of its Agents" in the CBRE General Release to just "CBRE Capital Markets." (Docket Entry No. 16, Ex. F at 79). Beggins wanted to preserve any claims he might have against General Electric for his pension benefits. (Docket Entry No. 19, Ex. A, Joseph Beggins Dep. 153: 1-13).

Beggins sent the edits to Majewski, who forwarded the changes to Chris Shamaly in CBRE's general counsel office. (Docket Entry No. 19, Ex. D at 3). Shamaly told Majewski that the changes to the release were "probably not acceptable" by CBRE's human resources office, but that he would "send it to them for review." (*Id.*). Shamaly forwarded the changes to Nadine Chang, assistant general counsel for CBRE, stating: "Have you had a chance to look at this? . . . If none of his lawyer's changes are acceptable, that's okay. At a minimum, I assume the changes to the [release agreement] are not all acceptable." (*Id.* at 4). Chang responded, "His changes are ridiculous. We should discuss." (*Id.*).

A few days later, Majewski sent back a new agreement incorporating and rejecting some of Beggins's proposals. (Docket Entry No. 16, Ex. G). CBRE rejected Beggins's proposal to change "CBRE and all of its Agents" to limit the release to "CBRE Capital Markets." (*Id.*).

On the same day, Beggins spoke by phone with Majewski and Shamaly to discuss the release and explain that he did not want to release General Electric. (Docket Entry No. 19, Ex. A, Joseph Beggins Dep. 166: 12–19; Ex. B, Chris Shamaly Dep. 13: 2–18). Beggins asked Majewski and

Shamaly what the word "agents" meant in the general release. They told him they did not know. (*Id.*, Ex. A, Joseph Beggins Dep. 166: 7–19). Majewski and Shamaly told Beggins that he could send back another edited agreement that expressly excluded General Electric from the release provision, instead of changing "CBRE and all of its Agents" to "CBRE Capital Markets." (*Id.* 168: 3-11, 213: 7–14).

One week later, Beggins sent another proposed agreement to Majewski. (Docket Entry No. 16, Ex. H). In the revised release form, instead of changing the "CBRE and all its Agents" language, Beggins added the following line:

> It is acknowledged that [CBRE and all of its Agents] does not include the General Electric Company, General Electric Capital Corporation or any of its respective subsidiaries, affiliates, divisions, predecessors, successors, officers, directors, shareholders, employees, representatives or agents.

(*Id.* at 109). Beggins did not get a response. On September 1, 2015, he emailed Sullivan, Majewski, Shamaly, and Chang to ask whether CBRE had decided to accept or reject his most recent proposed agreement. (*Id.*, Ex. I at 124). Chang responded that CBRE was in the process of revising the documents. (*Id.*). Beggins contacted Chang again on September 10 for an update and did not receive a response. (*Id.* at 123). On September 16, Beggins contacted Chang for a third time and Chang responded:

> Apologies for the delay. We will be updating the retention and general release agreement that you marked up and returned to us. We will not accept the change that you made that indicates that [General Electric] Corporation and [General Electric] Capital are excluded from the arbitration agreement or release, however, I believe we are close to agreement on the other changes that you made.

(*Id.* at 122). Beggins responded: "Thank you Nadine, that is all I needed to know. Much appreciated." (*Id.*). Beggins testified that he understood this interaction to mean he would receive

the standard CBRE retention agreement and release with the previous "CBRE and all of its Agents" language. (Docket Entry No. 19, Ex. A, Joseph Beggins Dep. 202: 3–203: 7). Beggins testified that he planned to sign this agreement. (*Id.*).

A few months later, after another phone call between Majewski and Beggins, Majewski sent Beggins a final retention and release agreement on December 21, 2015. (*Id.*, Ex. J at 136). The release language stated:

> Employee does . . . release, acquit, and forever discharge CBRE, GEMSA, and any of their respective direct or indirect subsidiaries, shareholders, members, customers and partners and any affiliates of any of the foregoing, and each of their respective officers, directors, employees, representatives and agents, together with their respective predecessors, legal representatives, successors and assigns . . . For the avoidance of doubt, General Electric Company, General Electric Capital Corporation and all of their affiliates are "Released Parties" under the terms of this Agreement.

(*Id.* at 129).

Beggins did not sign the agreement. (Docket Entry No. 19 ¶ 21). CBRE terminated his employment on January 1, 2016. (Docket Entry No. 16, Ex. K at 135).

More than four months later, Beggins applied for benefits under the General Electric Pension Plan, General Electric Supplementary Pension Plan, General Electric Savings and Security Program, General Electric Layoff Benefit Plan, and General Electric Healthchoice for Retirees Plan. (*Id.*, Ex. N). One month later, the General Electric Pension Board denied Beggins's claim for benefits. (*Id.*, Ex. K at 136). A month after that, Beggins sent Majewski a letter demanding severance compensation and benefits from CBRE in exchange for his willingness to release his claims against CBRE, but not General Electric entities. (*Id.* at 136–37). CBRE did not respond, and Beggins filed this lawsuit. (Docket Entry No. 19 ¶ 21). Discovery and this motion followed.

## II.     The Legal Standards

## A.     Summary Judgment

"Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (citations omitted); *see also* Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)). "The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.'" *Brandon v. Sage Corp.*, 808 F.3d 266, 269–70 (5th Cir. 2015) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating...that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 n.16 (5th Cir. 1994)). A fact is material if "its resolution could affect the outcome of the actions." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *Pioneer Exploration, LLC v. Steadfast Ins. Co.*, 767 F.3d 503 (5th Cir.

2014).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 331 (5th Cir. 2016) (quoting *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010)). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision*, LLC, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Darden v. City of Fort Worth*, 866 F.3d 698, 702 (5th Cir. 2017).

### B. Negligent Misrepresentation

Under Texas law, the elements of negligent misrepresentation are: "(1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies 'false information' for the guidance of others in their business, (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information, and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation." *LHC Nashua P'Ship, Ltd. v. PDNED Sagamore Nashua, L.L.C.*, 659 F.3d 450, 458 n.8 (5th Cir. 2011) (quoting *Fed. Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991)). "Because every element of a negligent misrepresentation claim must be established in order for there to be recovery, the absence of any element is grounds for summary judgment." *Miksch v. Exxon Corp.*, 979 S.W.2d 700, 706 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (citing *Stone v. Lawyers Title Ins.*

*Corp.*, 554 S.W.2d 183, 185 (Tex. 1977)).

"The 'false information' contemplated in a negligent misrepresentation case is a misstatement of existing fact, not a promise of future conduct." *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 439 (Tex. App.—Houston [14th Dist.] 2004) (citing *Allied Vista, Inc. v. Holt*, 987 S.W.2d 138, 141 (Tex. App.—Houston [14th Dist.] 1999, pet. denied)). "A promise to act or not to act in the future cannot form the basis of a negligent misrepresentation claim." *Id.* (citing *Miksch*, 979 S.W.2d at 706). "The plaintiff must prove that the defendant misrepresented an existing fact in the course of the defendant's business." *Id.* Deciding whether a statement is a promise of future conduct, rather than an existing fact, is a matter of law. *See id.*

A defendant may misrepresent an existing fact by omission. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App.—Houston [1st Dist.] 2010). "[W]here there is a duty to speak, silence may be as misleading as a positive misrepresentation of existing facts." *Id.* (quoting *Smith v. Nat'l Resort Cmty., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979)). "A duty to disclose may arise in four situations: (1) when there is a fiduciary relationship; (2) when one voluntarily discloses information, the whole truth must be disclosed; (3) when one makes a representation, new information must be disclosed when that new information makes the earlier representation misleading or untrue; and (4) when one makes a partial disclosure and conveys a false impression." *Id.* (citation omitted). Deciding whether a duty to disclose exists is a matter of law. *Id.* (citing *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001)).

### C.     Administrative Exhaustion Under ERISA

"[C]laimants seeking benefits from an ERISA plan must first exhaust available administrative remedies under the plan before bringing suit to recover benefits . . . ." *Gonzalez v. Aztex Advantage*, 547 F. App'x 424, 427–28 (5th Cir. 2013) (quoting *Bourgeois v. Pension Plan for*

*Emp. of Santa Fe Int'l Corps.*, 215 F.3d 475, 479 (5th Cir. 2000)). "The primary purposes of the exhaustion requirement are to: (1) uphold Congress' desire that ERISA trustees be responsible for their actions, not the federal courts; (2) provide a sufficiently clear record of administrative action if litigation should ensue; and (3) assure that any judicial review of fiduciary action (or inaction) is made under the arbitrary and capricious standard, not *de novo*." *Denton v. First Nat. Bank of Waco, Tex.*, 765 F.2d 1295, 1300 (5th Cir. 1985). The Fifth Circuit recognizes an exception to the failure-to-exhaust-administrative-remedies affirmative defense "when such attempts would be futile" and when the plan provides inadequate remedies. *Wilson v. Kimberly-Clark Corp.*, 254 F. App'x 280, 286 (5th Cir. 2007).

"[U]nder 29 C.F.R. § 2560.503–1(b), an ERISA benefit plan must 'establish and maintain reasonable procedures governing the filing of benefit claims, notification of benefit determinations, and appeal of adverse benefit determinations . . . .'" *Koehler v. Aetna Health Inc.*, 683 F.3d 182, 191 (5th Cir. 2012). "In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of [29 C.F.R. § 2560.503–1] . . . a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under [29 U.S.C. § 1132(a)] . . . ." *Id.*

## III.    Analysis

### A.    Negligent Misrepresentation

Beggins argues that CBRE made negligent misrepresentations in four ways: (1) Shamaly and Majewski misrepresented that they did not know what the word "agents" meant in CBRE's general release and told Beggins to revise the agreement to make clear that he did not want to release General Electric; (2) Shamaly did not disclose to Beggins that his edits were probably unacceptable and that Chang thought they were "ridiculous"; (3) Chang misrepresented that although General

Electric would not agree to Beggins's edits, CBRE was updating the retention and general release agreement, which "falsely convey[ed] the existence of an agreement in principal and that negotiations were still in process;" and (4) Chang failed to tell Beggins that any revised agreement CBRE was working on would expressly state that General Electric was a released party. (Docket Entry No. 19 at 15–16). Beggins argues that had he known his changes were unacceptable or no longer negotiable, he would have either signed the agreement and release with the standard language releasing "CBRE and all of its Agents" or he "would have pursued the CBRE severance benefits to which he was entitled under the Plan." (*Id.* ¶¶ 19, 20). Beggins also alleges in his complaint, but does not argue in his response to CBRE's motion for summary judgment, that he was contacted about other employment opportunities that he did not pursue. (Docket Entry No. 11 ¶ 10).

CBRE argues that Beggins cannot properly raise three of his negligent misrepresentation claims—the phone call with Shamaly and Majewski, Shamaly's failure to tell Beggins he knew Beggins's changes were probably unacceptable, and Chang's failure to tell Beggins that CBRE would add express language releasing General Electric—because Beggins did not present these claims in his complaint. (Docket Entry No. 11). New claims cannot be raised in a response to a summary judgment motion if they were not alleged in the complaint. *See Cutrera v. Bd. of Sup'rs of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005) (citing *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir. 1990)) ("A claim which is not raised in the complaint but, rather, is raised only in response to a motion for summary judgment is not properly before the court."). While Beggins generally alleged negligent misrepresentation in his complaint, (Docket Entry No. 11 ¶ 27), he did not specify the conduct, statements, or omissions. Beggins is not required to allege specifically every fact that is a negligent misrepresentation, but he must allege facts that assert a plausible, nonconclusory basis for his claim and give CBRE notice of what he claims were the



misrepresentations. *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 415–16 (5th Cir. 2015) (affirming summary judgment for an equal protection claim, the facts of which had not been adequately alleged in the complaint); *Jefferson v. Christus St. Joseph Hosp.*, 374 F. App'x 485, 492 (5th Cir. 2010) (affirming summary judgment because the plaintiff's complaint did not allege facts describing claims for disparate impact or hostile work environment).

A timeline is helpful. A summary is set out below, in chronological order:

Beggins's complaint contained the following allegations relating to possible claims for negligent misrepresentation:

- "At the time of [the retention agreement] discussions, Beggins had been contacted regarding alternative employment opportunities. Additionally, Beggins was

eligible to participate in CBRE's Severance Plan. Nevertheless, Beggins relied on the promises and representations made by CBRE and continued to provide the agreed upon services to CBRE." (Docket Entry No. 11 ¶ 10).

• "On August 7, 2015, Beggins received a revised version of the retention agreement from Majewski. Several telephone calls between Beggins, Majewski and Chris Shamaly ('Shamaly'), CBRE's Division General Counsel at the time, followed attempting to clarify certain defined terms contained in the Retention Agreement and/or Release relating to 'affiliates,' 'Agents' and 'Released Parties.'" (*Id.* ¶ 14).

• "As CBRE was unable to respond definitively to Beggins' questions and concerns, Shamaly suggested that, in order to remove any doubt as to whether parties other than CBRE, including [General Electric] were included as released parties, Shamaly directed Beggins to revise the Retention Agreement to address his concerns and submit it to CBRE for further consideration." (*Id.* ¶ 15).

• "Majewski informed Beggins that his edits had been sent on to Nadine Chang . . . , Vice President [and] Assistant Counsel for CBRE Legal Services, for review and approval." (*Id.* ¶ 17).

• "Beggins continued to follow up with CBRE on the status of the Retention Agreement in order to obtain some 'clarity on the question of the retention of [his] services.' However, there was no response from CBRE until September 16, 2016 . . . ." (*Id.* ¶ 20).

• "Based on Chang's [earlier] representations . . . , Beggins expected to receive a document for signature incorporating his proposed revisions but for the exclusionary General Electric language which he was prepared to execute and return to CBRE." (*Id.* ¶ 21).

• "However, CBRE, despite its representations and promises to the contrary, failed and refused to pay Beggins the Retention Payment despite Beggins's performance under the Retention Agreement." (*Id.* ¶ 24).

These allegations do not support a claim that Shamaly and Majewski made a

misrepresentation to Beggins when they told him they did not know what the word "agents" meant and encouraged Beggins to submit more revisions. The complaint allegations neither state nor imply that Shamaly and Majewski were lying to Beggins or that they in fact knew how CBRE or General Electric defined or understood the word. These allegations do not support a claim that Shamaly made a misrepresentation to Beggins by failing to tell him that his edits were probably unacceptable to CBRE. The allegations do not say, or support an inference that, Shamaly was withholding contrary information from Beggins. Finally, these allegations do not state a claim for negligent misrepresentation based on the theory that Chang failed to disclose to Beggins that any new agreement would expressly state General Electric was a released party. The allegations do not refer to the express language CBRE added in the agreement it sent to Beggins on December 21, 2015.

Even if Beggins was granted leave to amend his complaint, this amendment would be futile because Beggins's misrepresentations claims also fail on the merits, as explained below. *See* Fed. R. Civ. P. 15(a)(2); Fed. R. Civ. P. 16(b)(4). Even if Shamaly and Majewski knew what "agents" meant and misrepresented their knowledge to Beggins in the telephone call, Beggins has failed to raise a factual dispute as to whether, or support an inference that, he suffered any pecuniary loss as a result. At most, Shamaly and Majewski prompted Beggins to submit an additional revision making clear to CBRE's legal office that he did not release General Electric from any claims. CBRE informed Beggins one month later that it would not accept this revision. During that month, CBRE points out, there is no record evidence that Beggins received or rejected down any job offers that he could and would have taken had he known what meaning CBRE gave to "agents" in the agreement. (Docket Entry No. 16 ¶ 19).

Beggins's next negligent misrepresentation claim concerns whether Shamaly had a duty to disclose on August 7 that Beggins's edits were probably unacceptable and that Chang thought them

14

"ridiculous." Misrepresentations must be about existing facts. Shamaly's emails to Chang expressing his opinion about Beggins's revisions and Chang's response referred only to Beggins's initial revisions, which included changing "CBRE and all of its Agents" to "CBRE Capital Markets" as the released party. These representations do not represent any existing fact as to CBRE's official position on whether Beggins could expressly exclude General Electric from release. When Shamaly told Beggins to propose revised language, he did not fail to disclose CBRE's "true" position, which at that point was unclear. *Cf. Playboy Enters., Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 260–63 (Tex. App.—Corpus Christi 2006) (the defendant had a duty to disclose when its owner repeatedly made clear in internal communications its position on the plaintiff's distribution of its publication). Shamaly did not have a duty to disclose this information as a matter of law and there is no claim for negligent misrepresentation under this theory.

Beggins's next negligent misrepresentation claim is that even though Chang told Beggins on September 16 that CBRE would not accept his proposed language that General Electric was not a released party, Chang did not disclose to Beggins that CBRE wanted to add in language to the agreement expressly releasing General Electric. The final agreement presented to Beggins on December 21 contained this language, instead of the original language releasing "CBRE and all of its Agents." The record is unclear if Chang knew between September 16 and December 21 that CBRE wanted to add express language releasing General Electric. Even if Chang did know and failed to disclose this, this negligent misrepresentation theory fails because Beggins did not identify any pecuniary loss suffered from his reliance on this failure to disclose. There is no record evidence that Beggins received or refused other job offers during this time. Beggins had between December 21 and his employment termination on January 1 to sign CBRE's severance agreement and release, in order to receive severance pay. Beggins also had the opportunity to sign the CBRE's revised

agreement and release explicitly releasing General Electric in order to receive the retention bonus. At most, Beggins lost the opportunity to sign an agreement with the less precise language releasing "CBRE and all of its Agents," instead of an agreement expressly releasing General Electric. The chance to argue contract ambiguity in a potential lawsuit is too attenuated to be considered a pecuniary loss.

Beggins's final negligent misrepresentation argument is sufficiently alleged but fails as a matter of law. He alleges that Chang made a misrepresentation on September 16 when she told him that CBRE would be "updating the retention and general release agreement that [Beggins] marked up," even though they would "not accept the change [he] made that indicates [General Electric] Corporation and [General Electric] Capital are excluded from . . . release." Chang's alleged promise that CBRE would revise the agreement was a promise about a future act. *See e.g., Roof Sys.*, 130 S.W.3d at 439 (an alleged statement that defendant would not issue a warranty until a roof system was installed was a representation regarding a future act); *Allied Vista*, 987 S.W.2d at 141 (the defendant's promises to pay the plaintiff an annual salary for a year while he started a recycling plant and to provide equipment for that plant were not about "existing" facts and could not be misrepresentations); *Miksch*, 979 S.W.2d at 706 (a promise not to terminate the plaintiff from her position was a "promise to refrain from taking some action in the future.") (emphasis in original).

Three of Beggins's negligent misrepresentation arguments fail because he failed to sufficiently plead facts supporting those claims in his complaint. Even assuming that these claims were adequately plead, they fail as a matter of law because CBRE had no duty to disclose or Beggins did not make a summary judgment showing of pecuniary loss resulting from the misrepresentation. Beggins's remaining negligent misrepresentation claim fails as a matter of law because the misrepresentation alleged concerned a future act. CBRE's motion for summary judgment on this

issue, (Docket Entry No. 16), is granted.

## B. Wrongful Denial of ERISA Benefits

Beggins argues that he was wrongfully denied benefits under CBRE's severance pay policy. CBRE argues in its summary judgment motion that the CBRE severance pay policy is not an ERISA-qualified benefit plan. (Docket Entry No. 16 ¶ 53). CBRE neither submits nor points to record evidence to support this argument. Beggins responds, pointing to the CBRE U.S. Employee Handbook, which states:

> CBRE has an ERISA-qualified severance plan should employment end due to a job elimination or reduction in force. Eligible employees may receive a lump sum severance payment based on years of employment with CBRE.

(*Id.*, Ex. D at 58). CBRE does not respond to this evidence. CBRE does not meet its burden to show that, as a matter of law, the severance pay policy was not an ERISA-qualified severance plan.

CBRE argues that Beggins failed to exhaust his administrative remedies because he did not follow the procedures outlined by CBRE's severance pay policy for submitting benefit claims. Beggins argues that he did exhaust because CBRE did not follow the notice procedures that the ERISA statute requires for all plans under 29 C.F.R. § 2560.503–1.

CBRE's severance pay policy states, in relevant part:

> The Severance Pay Policy shall be administered by the Human Resources Department . . . . [Human Resources] is responsible for ensuring proper preparation of all employee notification requirements and documentation. Employees should direct questions regarding any specific situation and/or the policy generally to the [Human Resources] Service Center . . . .
>
> As a condition of receiving any severance pay pursuant to this Severance Pay Policy, an eligible employee must sign in advance of receiving any severance benefits a full and complete release of all claims against [CBRE] . . . as prepared by [CBRE].

> The benefits provided for herein have been voluntarily established by [CBRE] and are not the result of, nor do they constitute, a bargained for agreement between [CBRE] and the employee. Accordingly, [CBRE] reserves the right to withdraw, rescind, amend, revise and/or change, at any time, with or without notice, any and all provisions of this Severance Pay Policy. . . .
>
> This "[Highly Compensated Employees] Severance Pay Policy" provides for severance pay benefits to Highly Compensated Employees . . . . If an employee is eligible to receive benefits from both the Basic Severance Pay Policy and the [Highly Compensated Employees] Severance Pay Policy, the employee is entitled to maximum benefits, but the employee is not entitled to receive benefits from both Policies. . . .
>
> All other employees, whose annual base salary is $100,000 or greater, and who is classified as both a "full time" and "exempt" employee, shall be considered a [Highly Compensated Employee] for the purposes of this [Highly Compensated Employees] Severance Pay Policy.
>
> . . . [CBRE], in its sole and absolute discretion, reserves the right to make exceptions to this Policy.
>
> The Eligible [highly compensated employee] must sign a Release . . . in order to receive any of these payments . . . Any deviation from the payment provisions . . . must be approved by the General Counsel or General Counsel-Employment.

(Docket Entry No. 16, Ex. D at 24–29).

A claimant who fails to comply with an ERISA-qualified plan's terms for receiving benefits fails to exhaust administrative remedies. *See McGowan v. New Orleans Emps. Int'l Longshoremen's Ass'n*, 538 F. App'x 495, 498–99 (5th Cir. 2013) (claimant failed to exhaust administrative remedies because the plan's terms required he file an appeal of denial of benefits within 180 days, which he did not do).

CBRE argues Beggins did not properly comply with CBRE's plan and failed to exhaust administrative remedies because Beggins: (1) did not sign the release prepared by CBRE once he

knew his express language excluding General Electric from release would not be accepted; and (2) did not submit a claim for benefits to CBRE's Human Resources Service Center. The CBRE U.S. Employee Handbook identified the email address and phone-number for the CBRE Human Resources Service Center. (Docket Entry No. 16, Ex. E at 41). Beggins instead submitted his claim in a letter through his counsel on July 14, 2016 to CBRE's chief operating officer, managing director, and assistant general counsel stating:

> [T]his letter will serve as Beggins' [sic] demand for severance compensation and benefits from CBRE in the types and amounts stated in the Release communicated in your notice of termination to Beggins.
>
> Of course, in exchange for the severance compensation and benefits due Beggins, he would be willing to provide specific releases of claims against CBRE while reserving his claims against the General Electric Company, General Electric Capital Corporation and [General Electric] Pension Board.

(Docket Entry No. 16, Ex. K at 136–37). Beggins argues that because he did not receive a proper denial of benefits and notice of the plan's procedures, as required by ERISA, he should be deemed to have exhausted administrative remedies.

CBRE does not dispute that it did not notify Beggins that his benefit determination was denied or explain how he could appeal. Rather, the parties do dispute whether Beggins submitted a claim for benefits at all. CBRE argues that he should have sent his benefits claim to the CBRE Human Resources Service Center, instead of by letter to CBRE leadership. CBRE relies on the severance pay policy statement that "[e]mployees should direct questions regarding any specific situation and/or the policy generally to the [Human Resources] Service Center." But this does not direct Beggins to submit severance benefits claims only to the Human Resources Center. The parties dispute the proper procedure for submitting a claim and whether Beggins followed it.

Under ERISA, summary plan descriptions of any employee benefit plan are to be distributed to participants and beneficiaries. 29 U.S.C. § 1022(a) (2009). The summary plan description includes the following information:

> The name and type of administration of the plan; . . . the procedures to be followed in presenting claims for benefits under the plan . . . the remedies available under the plan for the redress of claims which are denied in whole or in part (including procedures required under section 1133 of this title) . . . .

29 U.S.C. § 1022(b). The record evidence shows that CBRE did have a summary description plan available to employees, (Docket Entry No. 16, Ex. D at 46), which should indicate the proper procedures for submitting benefit claims under CBRE's severance plan. Neither party has presented this document and the court cannot resolve the dispute on the present record.

If Beggins was required to submit benefits claims to the Human Resources Service Center, his letter making a benefits claim to CBRE leadership did not follow the proper procedures and he failed to exhaust his administrative remedies. *See e.g.*, *Swanson v. Hearst Corp. Long Term Disability Plan*, 586 F.3d 1016, 1018 (5th Cir. 2009) (the claimant failed to exhaust administrative remedies when she sent a letter stating an intent to appeal a denial of benefits instead of filing an appeal, as required by the ERISA-qualified plan). If Beggins did properly submit his claim by sending his letter, then he has exhausted administrative remedies. There is a genuine factual dispute material to determining to whom, or to what department, Beggins should have submitted his claim for CBRE's severance benefits. The court cannot, on the present record, determine whether Beggins properly exhausted administrative remedies. CBRE's motion for summary judgment on this issue, (Docket Entry No. 16), is denied.

## IV. Conclusion

CBRE's motion for summary judgment, (Docket Entry No. 16), is granted in part and denied

in part.  Summary judgment on Beggins's negligent misrepresentation claims is granted.  Summary

judgment on Beggins's ERISA claim is denied.   A scheduling and status conference is set for

**Friday, July 13 at 3:00p.m.**

SIGNED on June 26, 2018, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge